*Reversed and remanded.*

[Opinion delivered February 24, 1886.]

---

[No. 2017.]

### ED. COLLINS *v.* THE STATE.

1. MURDER — CONFESSIONS — CASES APPROVED.— Under the common law rule the confession of a defendant, induced by promises or threats which may have influenced his mind, is not admissible against him under any circumstances. To this rule, however, we have statutory exceptions, one of which qualifies such confession as evidence when, in connection with it, the accused makes a statement of facts or circumstances which are found to be

true, and which conduce to establish his guilt. See the opinion *in extenso* for a statement of facts made by the accused in connection with his confession, which, being found to be true, and conducing to the establishment of his guilt, brought his confession within the exception and qualified it as evidence against him. Note also the approval on this subject of the rulings of this court in the cases of *Womack* v. *The State*, 16 Texas Ct. App., 178; *Weller* v. *The State*, id., 200; *Owens* v. *The State*, id., 448.

2. PRACTICE — CHARGE OF THE COURT.— Special charges, however correct, are properly refused if their substance is properly embraced in the general charge. The special charge requested in this case, to the effect that "the confessions of a defendant are to be received with caution," was properly refused, as being upon the weight of evidence.

3. SAME — PRIVILEGE OF COUNSEL.— The reading of law books to the jury is a matter controllable by the discretion of the trial court, and its action thereon will not be revised on appeal, except in a clear case of abuse. Note this case for an instance in which the trial court did not abuse its discretion in restraining the counsel for the defense in reading from a text-book.

APPEAL from the District Court of Tarrant. Tried below before the Hon. R. E. Beckham.

The indictment in this case charged the appellant with the murder of one Frank Boldin, in Tarrant county, Texas, on the 19th day of August, 1885. His trial resulted in his conviction of murder of the first degree, his punishment being affixed at a life term in the penitentiary.

Mrs. W. H. Rix was the first witness for the State. She testified that, during the summer and fall of 1885, she lived on the place of Mr. Charles Coppinger, in Tarrant county, Texas. Mr. Coppinger and his family left home to visit England, on the 15th day of July, 1885, and left the witness and her husband in charge of his place. The defendant was living on Mr. Coppinger's place, and continued to live there until the expiration of his time, on August 2, 1885. The deceased, a negro boy named Frank Boldin, had lived on Coppinger's place for several years, and was left on the place by Coppinger when he started to England. The defendant left Coppinger's place on the 2d day of August, when his employment expired. On the 6th day of the same month, one Tobe Turner came to the place with an order from defendant for his unpaid wages. The deceased disappeared on the 19th day of August, 1885. Between 9 and 10 o'clock on that morning, Mr. Rix told the deceased to go to the field, south of and in sight of the house, turn some cattle out of the field, and bring up a horse known as "Ten Cents," for him, Rix, to ride in helping the deceased to drive the cattle to their pasture, about four miles distant. The horse "Ten Cents" was then in the field with the cattle. The deceased left with a bridle in his hands. The

field was but a short distance from the house. The house and the north and east sides of the field were surrounded by a pasture. Brush and timber bounded the field on the east, and the west fork of the Trinity river ran south of the field and pasture. The field and the part of the pasture east of it were " bottom " land.

The deceased failing to return at the expiration of a half hour, Mr. Rix stepped a few feet from the door and called to him. He received no reply. The cattle were still in the field and in view, but the horse had moved off. The horse was presently seen on the hill east of the house. He then had on the bridle which the deceased had taken from the house. A shepherd dog and another young dog which belonged on the place went to the field with the deceased. The young dog returned late that evening. The shepherd dog came home about 10 o'clock that night, when witness fed him, and he left again and returned no more. The defendant came up to Coppinger's house on the next morning. He came from the east, along under the hill on the side next to the bottom. As the defendant approached the house the witness heard a shot fired at a point southeast of the house, rather under the hill and near the chicken coop. She started towards the point where the gun was fired, and met the defendant, with a gun in his hand. Defendant said that he fired the gun at a rabbit. Witness told defendant about the disappearance of the deceased, and the defendant told her that deceased had gone to Mr. Ferguson's. He went on to the house, remained about thirty minutes, and left, going off towards the bottom. About an hour after the defendant left, witness heard the report of a gun at a point somewhere in the bottom south of the house. Tobe Turner was at Coppinger's house twice after Coppinger left for England, and before the defendant quit work on August 2, 1885. He came to the house on the first Sunday of Mr. Coppinger's departure, and he and defendant rode off together just before 12 o'clock, and defendant returned about dark. Turner came to the house the second time about a week later, on which occasion he and defendant went to the garden down in the field, and sat there talking for some time.

When he disappeared the deceased was wearing an old slouch hat that had been torn and mended by himself, a pair of nearly new ducking pants, rolled up at the ankles, a blue shirt, a pair of coarse boots which had been mended about the heels, and a woolen vest which belonged to a suit of clothes kept in his trunk. He had in his pockets, when he left, a brass key belonging to Coppinger's pasture gate, the key to his room door, some glass marbles, an

almanac, a ball of thread, and perhaps some other small articles which the witness could not remember. About six weeks after the disappearance of the deceased, Justice of the Peace Zinn and several others, including Mr. Ross Bowlin, assistant county attorney, came to Coppinger's house to hold an inquest over a dead body found in a thicket in Coppinger's pasture. They brought the bones and clothing of the body to the house and exhibited the same to the witness. Witness identified the pants, boots, shirt, hat and vest as the articles of clothing worn by the deceased when he disappeared, and the glass marbles and the door and gate key as articles which he had in his pockets when she last saw him alive. Witness compared the vest found with the body with the coat and pants of the deceased, then in his trunk, and found the material and buttons the same. The heels of the boots, and the hat found with the body, showed rents and repairs of the exact kinds and at the exact places as did the boots and hat worn off by the deceased. Deceased, when he disappeared, had in his possession a written order for a pony recently given to him by Mr. French. Deceased was about sixteen years old, rather heavily built, but short of stature.

Cross-examined, the witness testified that she did not see the marbles, keys, almanac and ball of thread in the deceased's pocket on the day of his disappearance, but she knew that he owned those things and usually carried them in his pockets.

William Rix was the next witness for the State. He testified that when Coppinger left home for England in July, 1885, he left witness and his wife, who had just testified, in possession and in charge of his place in Tarrant county, Texas. The defendant was an employee on the place at that time, and remained at work on the place until the expiration of his term of service, on the 2d day of the August following. Deceased was also in the employ of Coppinger, and was left on the place by the latter when he went to England. On the morning of August 19, 1885, the witness discovered that a bunch of cattle had broken into the field at the home place during the night, and told the deceased to take a bridle, catch the horse called "Ten Cents," then in the field with the cattle, drive the latter out of the field, and that he, witness, would help deceased to drive them to their proper pasture, about four miles distant from the home place. The deceased accordingly took a bridle and went off down the field towards the cattle and the horse, and the witness went into the house. About thirty minutes later the witness went out to see if the cattle had been driven out of the field. He saw that the cattle were still in the field, but neither the deceased nor

the horse were in sight.   Witness called the deceased by name, but got no reply.   He then saw the horse, with the bridle on, which deceased had taken with him, standing in the pasture east of the house. Witness never afterwards saw the deceased alive.   He went to the pasture, got the horse and drove the cattle to the big pasture himself.   On the 6th day of August, four days after the expiration of his time when he quit, the defendant sent to the witness, by Tobe Turner, an order for a balance due him on his wages, which amount the witness paid to Turner.   Turner was at Coppinger's place a time or two after Coppinger left and before the defendant's time expired on August 2d.   Witness saw defendant and Turner ride off together on one occasion, when Turner came to the house, and saw them at another in close conversation in the garden near the house.   Witness, some time after the disappearance of the deceased, saw the clothing worn off by the deceased.   That clothing was then in the possession of Justice of the Peace Zinn, who came to the Coppinger place to hold an inquest over the dead body found in the pasture. This was about six weeks after the deceased disappeared.   The deceased generally carried in his pocket a knife, a door key, a brass gate key and some glass marbles.   He also had in his possession, when he disappeared, an order for a pony given to him by Mr. French.   Witness had a gate key which was the mate of the one carried by the deceased.   Witness compared his key to the one shown him by Squire Zinn, and found them alike in every respect. Witness identified the boots shown him by Squire Zinn, as the boots worn by the deceased when he disappeared.   The heel of each boot had been worn off by deceased, and witness had them repaired for deceased a few days before his disappearance, and the manner of the repairs enabled witness to identify them beyond question.

Cross-examined, the witness testified that the deceased had a room on Coppinger's place, in which he usually slept.   The weather was warm during the time the defendant worked at Coppinger's, and deceased and defendant got into the habit of sleeping under a shed, one in a wagon, and the other in a loft.   Deceased had been employed on Coppinger's place since the early spring of 1885.

Jerry Smith testified, for the State, that he and two other boys, George Smith and Pat McCracken, went hunting together in September, 1885.   In their search for game they went into Mr. Coppinger's home pasture, and while traversing it, they found the remains of a dead person, in the bottom east of the field.   The body lay about fifty yards north of a lake, in the edge of a thicket.   The space in every direction was covered with timber, but the brush

and undergrowth were thicker about the point where the body lay than elsewhere in the immediate neighborhood. The boots and pants were still on the body, but the shirt and vest, which seemed to have been rolled together into a bundle, lay a little to one side. The hat was lying near the skull, which was separated from the other parts of the skeleton by a pole. The skull had been broken in from the front. The pants covering the legs of the skeleton were of the kind known as ducking overalls, and were rolled up at the ankles. The boots were of the common coarse kind. The hat was an old slouch, and had been torn and mended. Negro wool or hair was found near the skull, and on the pole near which the skull was lying. Witness thought at the time that these articles of clothing were the articles he had seen worn by the boy Frank Boldin. The witness had worked for Mr. Coppinger during the time that defendant and deceased were in his employ, and had seen deceased wearing clothes similar to those found on the skeleton. The flesh had all disappeared from the skeleton. The pants, with the bones in them, lay with the feet pointing north. Witness did not touch a thing about the skeleton. The inquest over the remains was held on the day after they were found. The remains were found at a point about one hundred and fifty yards below Mr. Coppinger's field, and about the same distance from the prairie on the north.

Some time in August, and the witness thought about two weeks before he found the remains, the defendant came to the witness, who then lived on West Fork, about one mile east of Coppinger's house, and borrowed a Winchester rifle from the witness, for the purpose, he said, of shooting a beef he could not drive. He got the gun, and left on foot, going up the river towards Mr. Coppinger's place. The defendant kept the gun for a week at least, during which time witness met him and asked him about the gun. He told witness that he had left it with Tobe Turner, and that Turner had left a pistol with him, defendant, as security for the return of the gun. At this point, a skull, subsequently identified as the one taken from the thicket, was shown to the witness, and he testified that it very much resembled the skull found with the other bones. It was broken in front just as the skull found was broken, but a little more on the side.

George Smith testified, for the State, that he, his brother Jerry Smith, and Pat McCracken, while hunting in Mr. Coppinger's pasture in September, 1885, found the remains of a dead negro. Witness knew the skeleton to be that of a negro only by the negro hair or wool which he found near the skull. The skull had been mashed

in at the forehead. The bones of one of the arms lay across the bones of the breast. None of the bones were disturbed when found.

Doctor J. M. McKnight testified, for the State, that he had been a regular practicing physician for the last ten years. The witness identified the skull exhibited to him as the skull which he examined in September, 1885, in the office of Squire Zinn, on the occasion of an inquest being held over the remains of a body said to have been found in Mr. Coppinger's pasture. The fracture as it is was the same as when witness first saw the skull, except that some loose fragments of bone then hanging to the side had since fallen entirely off. The fracture of the frontal bone was the same as it was when witness first examined it in September, 1885. The fracture in this case was a complete fracture of the frontal bone, nearly the entire right half of the same being gone, and was a complete fracture of the right temporal bone, extending from the fracture of the frontal bone back to and behind the ear. This fracture was something over an inch wide, and, when witness first saw the skull in September, 1885, that part of the fracture which is gone was still adhering to the skull. It was broken apart by the handling of the skull. The witness had fitted the fragments to the skull at the fractures both in front and at the side, and was positive that the fragments belonged to the skull and came from it. It was the opinion of the witness that the skull was fractured by two or more blows with a heavy, blunt instrument. The fracture could not have been made by a single blow. A like injury on the head of a living person might produce instant death by producing concussion and paralysis of the brain, or the person so injured might linger for some time before dying. The club exhibited to the witness was capable of breaking a skull in the manner in which the skull in evidence was broken.

Cross-examined, the witness testified that he was unable to decide whether or not the skull in evidence was the skull of a white person or a negro. A few strands of negro hair or wool, still adhering to it, indicates that it is the skull of a negro. Witness could express no opinion as to when the skull was fractured,— whether before or after death.

John F. Zinn testified, for the State, that he was one of the justices of the peace of precinct number one of Tarrant county, Texas, and held that office during the year 1885. On the 28th day of September, 1885, the witness was called upon to hold an inquest over a dead body found in Charles Coppinger's pasture. Mr. McCracken told the witness that his son Pat, while hunting, had found a dead

body in the pasture of the said Coppinger, about three miles from
the city of Fort Worth. Witness summoned a jury of inquest and
repaired to the said pasture. They found the dead body of a male
person in Coppinger's pasture, at the edge of a thicket and about
one hundred and fifty yards distant from Coppinger's field, and be-
tween a fourth and a half mile distant from Coppinger's house, in a
south or southeasterly direction from the house. The skeleton was
surrounded by a thick growth of timber. The timber was open to
the south of the skeleton, but a dense thicket stood to the north, and
the skeleton lay in the exact south edge of the thicket. The skele-
ton was entirely denuded of flesh, but all, or nearly all, of the bones
were found. The feet bones were encased in a pair of coarse boots
that had been mended at the heels. The leg bones were found in a
pair of ducking overalls, which appeared to have been worn but
little. These were rolled up at the ankles. An old slouch hat that
had been torn and mended, a woolen vest and a blue shirt were
found near the bones. Witness searched the pockets and found a
brass key, a common door key, some glass marbles, a ball of thread,
and some kind of a small book, and an° order in the handwriting of
Mr. M. M. French, concerning a pony. Witness knew French's
handwriting, and knew that the handwriting of the order was his.
A small pole separated the skull from the other portion of the skele-
ton. The skull was broken in at the front part of the right side.
Witness identified the skull in evidence as the skull found with the
skeleton, and stated that its present condition was the same as when
it was seen by him on the ground, except that some fragments then
adhering to it dropped off while being handled at the inquest. Wit-
ness had the skull taken to his office in Fort Worth, and there had
it examined before the jury of inquest by Doctor McKnight. Wit-
ness found some negro wool lying about the skull and the small
pole. Witness took the clothing and articles found with them to
the house on Coppinger's place, occupied by Mr. and Mrs. Rix, who
then and there identified them as the clothing and articles of the
boy Frank Boldin, who had disappeared in August. Assistant
County Attorney Ross Bowlin went with the witness and the jury
to Coppinger's pasture to view the remains.

Cross-examined, witness testified that, in his opinion, the skull
was the skull of a negro. No one ever saw the skull of a white
man so thick as the skull in evidence, and this skull had a ridge on
top which the witness did not believe could be found on the skull of
a Caucasian.

R. H. Tucker testified, for the State, that he was a deputy sheriff

of Tarrant county, and held that position in August, 1885. About the middle of the month of October, 1885, the defendant was arrested and confined in the Tarrant county jail, charged with the murder of the deceased. On the next day, a little after noon, the witness took the defendant from the jail, and, in company with Assistant County Attorney Ross Bowlin, took him out to the scene of the murder. They went in a double-seated buggy, Bowlin sitting in front and driving, and witness and defendant sitting together on the back seat. . When Coppinger's field was reached, Bowlin got out of the buggy and went into the field to interview Mr. and Mrs. Rix, leaving the witness and the defendant in the buggy. During Bowlin's absence witness talked to the defendant about the murder. He told the defendant that Tobe Turner had given the whole thing away, and was trying to fasten the whole crime on him, the defendant, and that he had better give his side of it, and set himself right before the public; that the very best thing he could do was to tell all that he knew about the transaction, and that, perhaps, he might escape punishment by turning State's evidence. Witness told him that if he would make a clean breast of it, he, witness, would do all he could for him, and try to get Bowlin to do all he could. Defendant replied that he would reserve any statement about the matter until he could have an understanding with Bowlin. When Bowlin returned the party (witness, defendant and Bowlin) went down into the woods. About this time Mr. Coppinger, Zach Castleberry and perhaps one or two others joined them. Witness, defendant and Bowlin withdrew a short distance from the crowd, and witness told Bowlin what had transpired between him and defendant. Bowlin then said to defendant: "Anything you say will be used in evidence against you, but I will try to save your neck. If you tell all about it you shall not be hung, and if I shall be forced to use either you or Tobe Turner as a State's witness, I will use you. I cannot, however, make you any promises." Defendant replied to Bowlin that he would be willing to go to the penitentiary if he could "sail that d—d son-of-a-b—h, Tobe Turner, in." He then said that he would disclose the facts connected with the murder, and proceeded to do so.

The defendant said that he and Tobe Turner killed the negro boy Frank Boldin; that Turner knocked the boy off of his horse with a club of cord wood; that he, defendant, then took a rope from Turner's saddle, tied it to the negro's leg, and dragged the body off to the thicket; that he, defendant, afterwards went back to the body and killed the dog; that he could and would go and show the witness and others the place where the negro was knocked from

the horse, the trail over which the body was dragged, and the spot where it was left; that he could produce the fatal club from the lake into which it was thrown, and that he could find, at the place where he threw it, the strap with which he led the dog from the body to his death. This conversation occurred at a point about two hundred and fifty yards distant, in a direct line, and about a half mile by buggy route, from the point where the negro's body was said to have been found. On the way to the place where the body was found, defendant told witness that Tobe Turner had urged him to help kill the negro for about ten days before he agreed. That he agreed to help kill the negro late one evening, and that he and Turner went to Fort Worth early next morning, and got horses at the stable of R. L. Turner, Tobe's brother, and went to Coppinger's pasture, intending to kill the negro Frank, and "rustle" six head of fat cattle, then in Coppinger's pasture. He said further, that, shortly after Coppinger left for England, he and Tobe Turner agreed to steal some of Coppinger's cattle, then running in the pasture; that, in accordance with that agreement, they drove several head of cattle out of Coppinger's pasture into the adjoining pasture of Mrs. Ryan, who was Turner's sister; that the negro Frank found the cattle in Mrs. Ryan's pasture, and drove them back to Coppinger's; that he and Turner penned them a second time in Mrs. Ryan's pasture, and that Frank drove them back to Coppinger's again; that Tobe Turner then said that it was no use in trying to "rustle" Coppinger's cattle as long as the negro lived, for he was always riding about the pasture, and would see them, "catch on," frustrate and "give them dirt" when Coppinger got home.

The defendant told the witness that when he and Turner went to Coppinger's pasture to kill the negro, as stated, they crossed the river and went through Mrs. Ryan's pasture into Coppinger's; that when they got to the corner of Coppinger's field they saw the negro in the field, riding the horse called "Ten Cents," and rounding up the cattle; that they spoke to him and told him that they had seen some cattle down on the lake which belonged to the upper pasture, and if he would go down there they would help him drive them out; that the negro then got down from his horse, opened the field gate and passed into the pasture, mounted his horse and started off towards the lake. Defendant said that he and Turner followed the deceased, riding together in his wake, and discussed the means of killing him. Turner had brought a pistol for the purpose of shooting him, but they concluded that such means was dangerous. They discovered a pile of cord wood presently, and from it Turner got a four-foot ash

cord-wood stick which had some knots on the small end, and carried it in his hand down by the side of his horse. They reached the lake, riding single file, the negro ahead, Turner next, and defendant behind. Turner rode up to the negro, a little behind and to one side, and struck him a blow over the head, which felled him. Turner then dismounted and beat the negro to death with the club, threw the club down, and remounted his horse. The defendant then, according to his statement, got off his horse, and threw the club into the lake just opposite the point of the killing, and then took a rope from Turner's saddle, tied one end to the negro's feet, and dragged the body to the thicket. The horse "Ten Cents," which the negro had ridden, ran off when the negro fell off, and went through the timber towards the open part of the pasture in a northerly course, which would have taken him into the open ground east of the Coppinger house. Witness tried but failed to catch the horse "Ten Cents." The negro groaned once or twice after he was struck, but did not speak. The defendant said further that he and Turner made no attempt to "rustle" the cattle after killing the negro. It was his, the defendant's, first experience in negro killing, and after he had dragged the body off, he told Turner that they had done enough for one day's work, and refused to do any more. He said that two dogs were with the negro when killed; that one was the shepherd dog "Charlie," and the other a young dog.

The defendant's narrative to Bowlin and the witness proceeded as follows: "On the next day I went back to where we left Frank. I don't know what made me go back. When I got back to where Frank's body was lying, I saw the shepherd dog lying down by Frank's head. He ran towards me and barked at me, and would not let me go near the dead body. The dog then went back to Frank's body and began licking the blood from his face. I then saw that I had to kill the dog. I was afraid he would go to the house to get something to eat and by that means give the thing away. I came back to Fort Worth, and, on the next morning, I took a new leather strap about four feet long, and went to Jerry Smith and borrowed his Winchester rifle and went back to Coppinger's again. I went up to the house and saw Mrs. Rix, and then went on down through the pasture and into the thicket where we had left Frank, and when I got there the dog was still there. He ran at me and tried to bite me, and it was some time before I could get hold of him. I made much of him, and finally caught him and tied the leather strap around his neck, and led him across into Ryan's pasture, a few hundred yards from there, tied him to a bush in a small

open space in the brush, and killed him. I then took him up and threw him over into the brush, and threw the strap down near where I had thrown the body of the dog. Tobe Turner had nothing to do with the killing of the dog, but I told him about killing the dog, and afterwards took him to and showed him the place where I did it. Turner had the gun in his possession during the time I had it borrowed from Smith. I told Turner that I threw the strap somewhere near where I left the body of the dog."

By the time the defendant had completed this statement, the lake was reached, and the witness and his party were joined by Charles Coppinger and his party. When a certain point near the lake shore was reached, the defendant pointed out a particular spot near some thorn bushes, and said: "There is where Frank was knocked off of his horse." He then pointed out a common cow trail along the lake shore, and said: "Here is the trail over which we dragged him." The party followed this trail, the defendant leading, a short distance in a northwest course, to a point where the defendant turned north out of the trail with the remark: "This is the way we dragged him." Defendant then went direct to the point where it was said the dead body was found, and said: "Here is where we left him." Some bones and teeth were still lying on the ground. The defendant picked up one of the latter, put it in his vest pocket, and remarked that he would keep that tooth to remember the son-of-a-b—h by. Witness examined the trail pointed out by the defendant, and discovered indications of a heavy drag over the ground. The chunks and sticks along the trail had evidently been pushed to the sides of the path, and lay almost regularly endwise with the trail. An old root was found in and across the trail just before the point at which the defendant left it was reached. Blood-stains were found on that old root, and on the grass growing near the trail. Blood was also found on an old stump which stood close to the trail near the point where the defendant said he left the trail with the body. From this point to the point where the defendant said they left the body there was no trail, and signs of a drag could be seen at but one place, and that was on a bunch of green briars over which defendant said the body was dragged, and on which a little blood was found. Falling leaves had covered the old root in the trail, since the body passed over it, and before the witness discovered the blood on the root he removed the leaves with a stick. From the point where, according to the defendant, the deceased was felled from his horse, to the point where the body was left, the distance, as well as witness could estimate it, was seventy-five yards.

Having shown the party the spot where he claimed the body of the negro was left, the defendant said: "Now come, and I will show you the club he was killed with." The defendant then led the way back to the lake, and searched the lake shore at a point about opposite where he said the fatal blows were struck. He then went up the lake twenty or thirty steps, picked up a stick of cord wood, and remarked, with an oath: "Here is the club that the son-of-a-b—-h knocked Frank off the horse with. I would know it among a thousand." He produced an ash cord-wood stick, about four feet long, knotty at the small end, and about three inches thick at the large end. Witness identified the stick in evidence, which was the same exhibited to Doctor McKnight, as the stick produced by the defendant. Defendant said, when he found the stick, that there was more water in the lake when it was thrown in, than when it was taken out; that the stick had fallen in at the edge of the water and had floated to the point where it was found. The stick was found on dry ground, but within the margin of the lake. The lake was nearly dry, and grass and weeds were growing down to the water edge. After producing the stick, the defendant said: "Now come, and I will show you where I killed the dog." He led the way, south, across the lake and into the woods and brush to a point, about five hundred yards distant from the lake, and there pointed out the remains of a dog. He called attention to a small bush in an open space, and said: "Here is where I killed the dog." He said that he tied the dog to that bush, stepped back about twenty feet and shot him in the head, and then removed the strap, threw it down and threw the carcass of the dog in the brush where it was found. He then looked about a little, and picked up a new-looking leather strap about four feet long, and said: "Here is the strap." The strap had blood-stains on it, and was tied in a loop at one end. The strap was produced and identified by the witness. The blood-stains were still on it, and the loop was still tied at the end. The bones of a dog, some pieces of hide, and some strands of long black hair, resembling the hair of a shepherd dog, were found on the ground. The skull bones were arranged by the witness and the parties with him, and, when put together, they showed distinctly the hole of a rifle ball. Standing over the remains of the dog, the defendant fell to weeping, and said that he "hated a d—d sight more the killing of the dog than seeing the negro killed." Witness did not tell the defendant what Tobe Turner had said about the murder of the deceased, nor relate to him the particulars of Turner's statement. Witness wanted to get the defendant's own story

from him, independent of any statement made by Turner. The defendant and Turner, up to the hour of defendant's statement, occupied separate cells in jail.

Cross-examined, the witness testified that the defendant was taken from the jail for the express purpose of being conveyed to Coppinger's pasture, and he was taken to the pasture for the express purpose of getting him to tell what he knew about the murder of the negro boy. The witness talked to him all the way, his one object being to get him to confess. Bowlin and the witness both talked to the defendant about the murder on the way out to the pasture. Defendant at first denied all knowledge of the killing. Witness told him that Turner had given the whole thing away, and was trying to throw the weight of the crime on him, and advised him to make a clean breast of his side of it. He asked witness what Turner had said. Witness, however, did not tell him. The defendant was brought to the jail about 10 o'clock on the night before he made this confession. Witness was not present when defendant was arrested, and did not know of his own knowledge what officer arrested him. Sam Farmer brought the defendant to the jail and turned him over to the witness. Tobe Turner came to the jail with them, but was not then under arrest. Witness arrested him, Turner, later on that night. Witness had been to the Coppinger pasture before, on the same day that he took the defendant out there. He went in the morning with Ross Bowlin, Sheriff Maddox, Charles Coppinger, Zach Castleberry and Tobe Turner. Turner was then under arrest, and was taken over the same ground afterwards traversed with the defendant. They went out with Turner about 9 o'clock, and returned about 12. They then got dinner at a restaurant, and took defendant out immediately after eating. They had Turner on the ground about two hours. Witness had seen the point where the dead body was said to have been found, before the defendant pointed it out. He was on that morning taken over a part of the trail over which the body was said to have been dragged after the killing. Nothing on the ground, at the alleged place of the killing, indicated it as a place where a man was killed. Witness had only the defendant's word to the fact that it was the place of the homicide. The trail over which the defendant said the body had been dragged showed plainly that something had been dragged over it. A part of that trail was pointed out by Turner on that morning. Turner located the trail at the point from which he and defendant said the body was dragged. Turner followed that trail, in guiding the party, some little distance, but before he arrived at

the point where the defendant afterwards said he left the trail with the body, he, Turner, stopped, took his bearings, and went direct to the point where he said the body was left, which was the point where the body was found. Turner turned from the trail some little distance before the point on it was reached where the witness afterwards found the first blood-stains. The first blood witness found was on the old root in the trail near the point where the defendant said he left the trail with the body. The next blood was on the stump at the point where defendant said he left the trail with the body. The blood witness saw on the grass outside of the trail was between the root and the stump. Witness saw no blood when he was on the ground in the morning with Turner, and did not know whether or not any of the other parties saw any blood at that time. Witness had some difficulty in finding the blood on the old root. The leaves had fallen and pretty well covered the trail. Witness removed the leaves and found the blood-stains on the root. The blood on the stump was the plainest of all the stains found. Turner left the trail twenty feet at least before reaching the point at which the first blood-stain was found. Witness knew nothing about the blood-stains, nor how the drag ran from the trail, until he got defendant on the ground. The drag showed over so much of the trail as was followed by Turner, but no effort was made to follow the trail further than the point to which Turner led the party. Witness had been told, before he went to the pasture with the defendant, that the fatal club would be found in the lake. The club was described to witness on that morning as a club four feet long, with knots on the small end, a crook in the middle, and such a club as might have been used as the false standard of a wagon. Turner searched the lake for the club in the morning, but failed to find it. Defendant found the club about twenty feet distant from the point on the lake where Turner looked for it. Turner on that morning pointed out to the witness the place where it was said the dog was killed, and told him that the string by which the dog was led to that place would be found somewhere in the vicinity. He described a string and not a strap. He did not indicate the exact place where the string could be found, but said that it was lying about there somewhere. Witness hunted for but failed to find it.

Re-examined, the witness said that Turner told him about the dog, the string, the club, etc., in the morning before defendant told anything about them. Turner, however, did not find or show the club or strap, and pointed out only a part of the trail over which the body was dragged. The defendant indicated the trail of the body from

the point which he said the deceased was stricken down, to the point where the body was found. Turner looked in the lake for the club, but said he did not throw it into the lake. The party did not look for the club, but had Turner do so while he was on the ground, and had the defendant to look for it while he was on the ground. Turner said that he had never seen the body of the dog, and knew of his being killed only from the fact that defendant, on the Sunday before their arrest, told him that he had killed the dog, and took him to the neighborhood and pointed out the place where he said the body of the dog then was.

Charles Coppinger was the next witness for the State. He testified that, at present, and during the year 1885, he lived about three miles northwest of the city of Fort Worth, Texas. He left home with his wife and family about the middle of July, 1885, to visit his former home in England. He left Mr. and Mrs. Rix in charge of his place during his absence. He returned home on the 2d day of the following October. The defendant worked for the witness off and on during the spring and summer of 1885, and on the 2d day of July commenced work under a contract for a month. Witness left him on his place when he went to England. He also left the deceased at work on his place. The deceased had then been in his employ some four or five years. He was, the witness thought, about nine years old when he first entered the witness's service. He had previously lived with Mr. Ferguson and Captain Kennedy. Witness's house stood on a hill in a pasture. His field was in the southwest corner of his pasture, and was south of his house. The West Fork river was the south boundary line of the field, and also of the pasture for some distance east of the field, where it leaves the river, and runs east to its junction with Andrews's pasture. Ryan's pasture joins that of the witness on the south. Ryan's house is on the south side of the river, about a mile distant from witness's house. A road runs through Ryan's pasture and crosses the river below the corner of witness's field, into witness's pasture, whence it leads to and through the gate at the corner of witness's field, into and through the field to the house. Timber and brush grow plentifully to the east of the field and pasture, the timber running east from the northeast corner of the field. The field north of the timber is open. There is a lake in the timber part of the pasture, about one hundred yards east from the center of the field.

When he left home for England, the witness charged the deceased particularly to keep a close watch over the cattle kept in the pasture. Witness was on the ground where it was said that deceased

was killed at the time that the defendant made the statement detailed by the witness Tucker. This was about three weeks after the witness returned from Europe.

The defendant, on that occasion, in the presence of witness, Deputy Sheriff Tucker, and Ross Bowlin, pointed out the point on the lake shore where he said Turner knocked the deceased from the horse and killed him. He said in that connection that the deceased did not speak, but groaned once or twice after the first blow was struck, and that deceased was struck without having an idea of impending danger. That he and Turner, on the evening before, agreed to commit the murder of deceased, and then steal six head of the witness's cattle. That Turner had been urging him to the commission of this crime for two weeks before he consented. That Turner's object in killing deceased was to remove him as an obstacle to the theft of the cattle. That they had twice driven several of the witness's cattle into Ryan's pasture for the purpose of stealing them, but that deceased recovered them. That, on the morning of and before the murder, they went to Fort Worth and got horses at R. L. Turner's livery-stable, obtained two pistols, and went to witness's pasture for the express purpose of killing the deceased and running off the cattle. That they traveled up the south bank of the river and crossed through Ryan's pasture into that of the witness, on the road which leads from Ryan's house to witness's house. That when they got to the gate at the corner of witness's field, they saw the deceased, riding " Ten Cents," bare back, among the cattle. That they told deceased that there were several head of stray cattle down by the lake, and offered to help drive them out of that pasture. That deceased passed through the gate and started on ahead towards the lake. That, as they followed behind deceased, he, defendant, and Turner discussed the shooting of the deceased with the pistols they had brought for that purpose, but decided that such means of killing him was perilous to their safety. That Turner got a cordwood stick and carried it along with him, down by the side of his horse. That they reached the lake riding in single file, the deceased in advance, singing. That Turner, who was next to deceased, struck him on the back of the head with the stick, knocked him off the horse, and then got down and beat him to death. That Turner then threw the stick down, and mounted his horse. That he, defendant, then dismounted, tied the rope to the deceased's feet and dragged him to the point where the body was found, which point the defendant pointed out. That he left the body with the head resting on a pole, returned to the place of the killing, secured the club

and threw it into the lake. He said that he tried to catch the horse "Ten Cents," but failed, and that the horse ran off in a direction which would have taken him into the clearing east of witness's house. That the witness's two dogs, "Charlie," a Scotch collie or shepherd, and a young dog, were with deceased when he was killed. That he went to the body afterwards and found the collie dog licking the face of the deceased. That the dog ran at, and barked at him, and he realized the necessity of killing the dog to prevent him from piloting some one to the body. That, accordingly, he procured a strap in town, borrowed Jerry Smith's Winchester gun, and on the next morning coaxed the dog to him, secured him with the strap, and led him off to a point he afterwards designated, when he killed him by shooting him through the head. That he then removed the strap from the body of the dog, and threw it down near the place of the killing, and threw the body of the dog into the brush. He then piloted the party to a point in Ryan's field, and produced the skeleton of a dog which the witness, by means of some hair found with it, recognized as the skeleton of his collie dog Charlie. Defendant said that Turner had nothing to do with the killing of the dog, but that he told Turner of the killing, and took him to the neighborhood and pointed out to him the place where he threw the body of the dog and the strap. The defendant also found, near the body of the dog, and at the root of a tree, a bright new leather strap (the one in evidence), and said that it was the strap used in leading the dog to the place of his death. The defendant led the way over the trail indicated by the witness Tucker in his testimony, and said that it was over that route that he dragged the body of the deceased. Witness described the appearance of the drag, blood-stains, etc., substantially as did the witness Tucker. The defendant, while at the place where the dead body was found, picked up a tooth that, presumably, had fallen from the skull of the deceased, placed it in his vest pocket, and said that he would keep it to remember the son-of-a-b—h by. He exhibited the pole across which he said the deceased's neck was laid, and witness observed blood spots on the pole.

The party went from the place where the defendant said he left the dead body, to the lake, where, after some little search, the defendant found a cord-wood club, knotty at one end, and bent in the middle, and exhibited it with the remark: "Here is the very club the son-of-a-b—h killed Frank with. I would know it among a thousand." He said that the stick had doubtless been floated, and wafted by the wind to the point where it was found, from the point

in the lake where it was thrown in, which point was some twenty or thirty feet from the place at which it was found. Witness identified the stick in evidence as the stick found near the lake by the defendant, and declared by him to be the identical stick with which Turner killed the deceased. While standing over the body of the dog the defendant said to the witness: "I hated like hell to kill the dog. I hated it a d—d sight more than I did the killing of the negro." The bones of the dog's skull were fitted together, and showed that he had been shot through the forehead, just as the defendant had said he shot him. Witness stepped the distances between the various points indicated in the testimony. From the field gate, where defendant said he and Turner first saw the deceased, to the point where he said Turner killed the boy, the distance was one hundred and forty-two steps. From that point, over the drag, to the point where he said the body was left, was forty-two steps. From that point to the carcass of the dog, the distance was seven hundred and forty-five steps. Witness looked for the carcass of his dog several times after he got home from Europe, but failed to find it. He had been satisfied from the first that the dog had been killed. A great attachment existed between the dog and the negro, and the dog followed the boy wherever he went.

Cross-examined, the witness testified that he was on the ground once before on the same day, in company with Sheriff Maddox, Deputy Tucker, Tobe Turner and Ross Bowlin. Tobe Turner pointed out the place where the boy was knocked off his horse, the point where the body was left, and indicated the neighborhood of the dog's bones and the strap (or string, as he described it), and a part of the trail or drag pointed out by defendant later in the day. He said that he had never seen the body of the dog or the string, but that defendant had told him where they could be found. Turner left the trail before he reached the point at which defendant subsequently left it, and went direct to the point where the body was left. He did not pretend to show all of the trail. The club was described to witness before defendant described it, and its presence about the lake was told by Turner. Turner, however, failed to find it, but he did not look nearer the point where it was subsequently found than twenty or thirty feet. The carcass of the dog and the strap were hunted for in the morning, but the search was unsuccessful.

Deputy Sheriff S. P. Maddox testified, for the State, that some *subpœnas* for the defendant as a witness in some gaming cases were placed in his hands during the first or second week in September.

Witness was informed that he would find the defendant, whom he did not then know, down about the bridge near the city of Fort Worth, and he went to that place to find the defendant and serve the papers. He found the defendant, and asked him if he knew Ed. Collins. He replied that he did. Witness then asked him if he could direct him how and where to find the said Ed. Collins. He replied that he could not, as Ed. Collins had gone somewhere into the country to pick cotton. On the next morning defendant came to the court-house and told witness that he was Ed. Collins, and that he threw witness off on the previous evening because he thought witness wanted him for something else than to testify in the gaming cases.

Ross Bowlin testified, for the State, that the place pointed out by the defendant as the place where he left the body was the place where the body was found. Witness was present at that place at the inquest. The stains on the stick exhibited to witness (the cordwood club), particularly one of the stains, resemble blood-stains very much, but were, in the opinion of the witness, water stains. Those stains were on the stick when it was found by the defendant. Opinions differed at the time it was found as to whether it was blood or water stains.

Mr. Rice testified, for the State, that he lived about six miles from Coppinger's place in 1885. From August 19th to October 20, 1885, the weather was very dry. One slight shower of rain fell on October 10, 1885. Witness did not know whether it rained more or less in Coppinger's neighborhood during that time than it did in his.

William Rix, recalled, testified, for the State, that after Mr. Coppinger left, and before the negro boy disappeared, he learned, on two different occasions, that some of Coppinger's cattle had got into Ryan's pasture, and he sent the deceased to turn them out and bring them home. Witness did not know how the cattle got from Coppinger's pasture into Ryan's. The fence between the two was in good repair. He had never seen defendant bothering cattle in Coppinger's pasture, but he once saw Tobe Turner "rustling" them. The State closed.

Deputy Sheriff J. H. Maddox testified, for the defense, that S. M. Farmer, Marshal Rea and others brought defendant to the jail, and delivered him to the witness. Tobe Turner and others were among the parties. Turner was not then under arrest, but was arrested later on the same night.

Messrs. McKnight, Knock, McDade, McMeakin and Rice testified that they had each known the defendant for several years, and that

his reputation as a peaceable, law-abiding and humane citizen had always been good. This was the first charge against the defendant that any of the witnesses had any knowledge of.

The motion for new trial raised the questions discussed in the opinion.

*A. G. McClung* and *W. D. Harris*, for the appellant.

*J. H. Burts*, Assistant Attorney-General, for the State.

WILLSON, J. I. In holding the confessions of the defendant to be admissible in evidence, the trial judge followed the recent decisions of this court. (*Womack* v. *The State*, 16 Texas Ct. App., 178; *Weller* v. *The State*, id., 200; *Owens* v. *The State*, id., 448.) We have not changed our view of the law as announced in those decisions, but still believe the same to be a correct interpretation of our statute upon the subject of confessions.

Although the defendant, in making the confession, may have been, and doubtless was, influenced by persuasion and promises, still, in connection with his confession, he made a statement of facts and circumstances which were found to be true, and which conduced to establish his guilt. By means of such statement, the bludgeon, the instrument with which he said the murder was committed, was found. It was not found from other information previously received concerning it from any other party, though it had been searched for upon such other information. Its discovery was attributable alone to the information given by the defendant; that is, he described it, told where it was, and went to the place where he said it was, found and produced it. This of itself was sufficient corroboration of his confession to render the confession admissible. (Code Crim. Proc., art. 750.) In addition to this corroboration, the confession was shown to be true by a number of other facts and circumstances detailed and pointed out by the defendant, and which it is not at all reasonable that he could have been so familiar with, and so accurate about, unless he had been a participant in the murder. He pointed out the place where the murder had been committed, the trail along which the dead body of the victim had been dragged, the carcass of the faithful dog of the deceased, which dog the defendant himself had tied and led away from the dead body of its master, and killed, in order to prevent it from being the means of a discovery of the murder, and he even found and produced the leather strap with which he had tied the dog to

effect its capture and death. His entire confession was strongly corroborated by numerous facts stated by him in connection therewith, every one of which facts was proved to be true, and but few of which he could have obtained so accurate a knowledge of in any other way than by being present and taking part in the transaction.

II. A full, clear and correct charge was given to the jury, embracing, in so far as the same were unobjectionable, the charges requested by the defendant and refused. To have instructed the jury as requested by the defendant, that "the confessions of a defendant are to be received with caution," would have been error, because it would have been a charge upon the weight of evidence. The other instructions requested and refused were in substance and sufficiently submitted in the charge given.

III. In his argument to the jury counsel for the defendant proposed to read section 683 of Wharton's Criminal Law (4th ed.), which recites the facts of a murder trial in Illinois in 1841, in which three brothers were tried for the murder of a man. During the trial one of the brothers made a full and detailed confession of the crime, but the supposed murdered man made his appearance in time to prevent conviction of the accused parties. The court refused counsel permission to read this section, but permitted him, without reading from books, to cite numerous instances of confessions made which were afterwards found to be untrue. It is insisted by counsel for defendant that in this action the court abused its discretion to the injury of the defendant. It has been repeatedly held by this court that the reading of books to the jury is a matter controllable by the discretion of the trial court, and that this discretion will not be revised on appeal, except in a clear case of abuse. (*Foster* v. *The State*, 8 Texas Ct. App., 248, and cases cited; *Cross* v. *The State*, 11 Texas Ct. App., 84.) We can perceive no abuse of such discretion in this instance.

Having fully considered all the questions presented in the record, some of which we have not thought of sufficient importance to discuss, and finding no error in the conviction, the same is affirmed.

*Affirmed.*

[Opinion delivered February 27, 1886.]